INDIANA HARBOR BELT RAILROAD CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 21550, 37661.   Promulgated April 30, 1929.

*Charles C. Paulding, Esq.,* and *William Mann, Esq.,* for the petitioner.

*John D. Foley, Esq., L. W. Creason, Esq.,* and *J. T. Haslem, Esq.,* for the respondent.

## OPINION.

PHILLIPS: The issues remaining for decision are (1) whether the difference between the value of materials and supplies turned over to the Director General of Railroads on December 31, 1917, and the value of such material and supplies turned back by him on February 29, 1920, is income to petitioner in 1920; (2) whether the amount of $9,442.06, representing the rental interest on the cost of completed additions and betterments accrued by petitioner in 1920, was income to it in that year; (3) whether a payment of $2,423.69 made by petitioner to its railroad Y. M. C. A. was a deductible item of expense; and (4) whether the rental interest on the cost of completed additions and betterments allowed petitioner in the final settlement by the Director General was income to it in 1923. Issues (2) and (4) will be considered together.

The evidence is to the effect that the value of the materials and supplies delivered to the Director General December 31, 1917, was $526,955.59, and the value of the materials and supplies which the Director General delivered to the petitioner at the end of Federal control was $650,900.17—a difference in value of $123,944.58. A final settlement between the parties was had in 1923, when the petitioner paid to the Director General $36,733.75 on account of materials and supplies, and $5,102.75 to adjust the price of materials and supplies used in additions and betterments, making a combined payment to adjust materials and supplies of $41,836.50. The Commissioner deducted this amount from $123,944.58, the differ-

ence in value between the materials received by the Director General and the materials returned, and treated the balance (which he further reduced by $3,417.17) as income to the petitioner.

With this treatment we can not agree. The contract between the parties on December 27, 1918, which is in evidence and under which settlement was made, provides in section 9 (b) that at the end of Federal control the Director General shall return to the company materials and supplies "equal in quantity, quality, and relative usefulness to that of the materials and supplies which he received," and to the extent he does not return such materials and supplies he shall account for the same at prices prevailing at the end of Federal control, and "to the extent that the company receives materials and supplies in excess of those delivered by it to the Director General it shall account for the same at prices prevailing at the end of Federal control, and the balance shall be adjusted in cash."

Since there is no evidence to the contrary, we assume that events transpired in their ordinary orderly course and that the settlement made in 1923 was in accordance with the terms of the agreement between the parties. To the extent that petitioner received materials and supplies in excess of those delivered by it to the Director General it paid for the same at prices prevailing at the end of Federal control. The amount paid by petitioner to the Director General in settlement of the materials and supplies account was $41,836.50. This paid for materials received by it in excess of materials equal in quantity, quality, and relative usefulness to those delivered by it to the Director General. The fact that the difference between the *value* of the materials received by it and the materials delivered by it to the Director General exceeded $41,836.50, is not here material. It is manifest that such increased value was due to the increase in the market value of physical units between the time they were delivered to the Director General and the time they were returned at the end of Federal control. The same was in all probability true of the entire railroad system, but such increase in value does not constitute taxable income. It was evidently the intention of the parties that petitioner should be saved whole at the end of Federal control. To this end there was first returned to it materials and supplies equal in quantity, quality, and relative usefulness to those which had been received. To the extent that materials and supplies equal in quantity, quality, and relative usefulness were returned by the Director General to the petitioner to replace materials and supplies received, there results no income taxable to the petitioner. There was merely a replacement in kind to the extent of the materials and supplies received. The excess of materials and supplies was purchased by the petitioner.

This case is to be distinguished from *Lehigh & Hudson River Railroad Co.*, 13 B. T. A. 1154. In that case the Director General failed to return materials and supplies equal in quantity, quality, and relative usefulness to that of the materials and supplies which he received and accounted for the shortage at prices prevailing at the end of Federal control in an amount which was apparently in excess of the cost to the petitioner of the materials and supplies which were not returned. The Board held that such transaction gave rise to taxable income and, being unable to fix the gain at an amount different from that determined by the Commissioner, it necessarily approved his determination.

In the present case the Director General returned materials and supplies not only equal in quantity, quality and relative usefulness to the materials and supplies received but in excess of such materials. The value of such excess materials, $41,836.50, was paid to the Director General by petitioner. In the *Lehigh* case the railroad company was in effect a vendor of the shortage in materials and supplies for cash at market value at the end of Federal control. It failed to purchase materials and supplies to make up the shortage, as it might have done under the statute and the Commissioner's regulations. In the present case such a reconversion was unnecessary since there were returned materials and supplies in excess of the materials delivered. The Commissioner erred in determining any gain from such transaction.

Under the contract between petitioner and the Director General, petitioner was to pay for certain of the additions and betterments made to its road. It was to be paid interest on the cost of such additions and betterments. In 1920 petitioner accrued on its books of account and included as income in its return $9,442.06 as interest due it from this source. This was excluded by respondent from the taxable net income for that year. This amount was not paid in cash by the Director General but his computation of the correct amount was included in the settlement in 1923. In this settlement petitioner was credited with interest of $38,588.38 on the cost of completed additions and betterments. It is agreed between the parties that this amount was allocated by the Director General as follows: $8,588.14 to 1918; $25,081.47 to 1919; $4,918.77 to 1920. In *Texas & Pacific Ry.*, 9 B. T. A. 365, following *Illinois Terminal Co.*, 5 B. T. A. 15, and *Great Northern Railway Co.*, 8 B. T. A. 225, this Board held that such interest is a part of the compensation to be paid by the Director General of Railroads and should be included in the computation of gross income in the year in which it accrued. Although the petitioner accrued $9,442.06 on its books in 1920, the Commissioner excluded this from income. The petitioner offered evidence showing the alloca-

tion made by the Director General of the amount paid and, in the absence of other evidence, we accept his computation. In accordance with the decisions cited above, $4,918.77 should be included in income for 1920. The amount of $38,588.38 having accrued prior to 1923, no part of it was taxable income to the petitioner in that year.

Petitioner's general operating offices are located at Gibson, Ind., a small town situated about 20 miles from Chicago, 4 miles from Gary, Ind., and 3 or 4 miles from Hammond, Ind. It had located on its property at Gibson a so-called Y. M. C. A., which it maintained for the benefit of its employees. The building contained a restaurant, rest room, and amusements of different kinds. Its purpose was to contribute to the necessities and comfort of petitioner's employees, and particularly its train crews which were required to lay over at this place. In addition to the other benefits, it enabled petitioner to keep its train crews at a central place where they could be readily called when wanted. Religious services were held at the Y. M. C. A. building on Sundays and it had a limited reciprocal arrangement with the Association by which Y. M. C. A. men could stop at petitioner's building in Gibson, and petitioner's employees were permitted to use the regular Y. M. C. A. to a limited extent. The employees were charged for their meals and for the use of the rest room, and whatever deficit remained was made good by petitioner each month. During the year 1922 it contributed $2,423.69 to meet such deficit.

We think that in a situation of this kind, where the Y. M. C. A. building was maintained primarily for the use of petitioner's employees in a small, out-of-the-way town and results in a direct benefit and convenience to it, the amount of money paid to make up any deficiency in the maintenance of such establishment is an ordinary and necessary expense in conducting its business and an allowable deduction from income. See *Poinsett Mills*, 1 B. T. A. 6; *Lihue Plantation Co., Ltd.*, 2 B. T. A. 740; *Franklin Mills*, 7 B. T. A. 1290.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

STERNHAGEN dissents as to the accrual of rental interest in 1920.